**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| KOCH ACTON, INC. d/b/a DYNAMIC BEACON,<br><br>       Plaintiff,<br><br>v.<br><br>BENJAMIN KOLLER, JUSTIN BRUN, and AGILE CREATIVE SOLUTIONS, LLC,<br><br>       Defendants. | Civil Action No. 1:21-cv-10374-FDS<br><br>**FILED UNDER SEAL<br>LEAVE GRANTED 6/9/2023<br>(ECF NO. 135)** |

**<ins>DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT</ins>**

Koch Acton, Inc. ("Plaintiff" or "Koch Acton") brought this case against Justin Brun ("Brun"), Benjamin Koller ("Koller"), and Agile Creative Solutions, LLC ("Agile") (collectively, "Defendants") claiming that they copied files from Dynamic Beacon, a digital marketing agency serving automobile dealers. Plaintiff alleges that Defendants used those files to solicit Dynamic Beacon clients and to serve Agile clients. While Plaintiff's assertion may have facial appeal, the undisputed material facts demonstrate that Defendants are entitled to summary judgment as a matter of law.

First, Plaintiff lacks standing to bring their claims. While Plaintiff may have purchased Acton Toyota of Littleton ("Acton Toyota"), the automobile dealership out of which Dynamic Beacon operated, the asset purchase agreement for that transaction is devoid of any reference to Dynamic Beacon, its assets, or its client contracts. Plaintiff does not own Dynamic Beacon, and so it lacks standing to vindicate any rights related to Dynamic Beacon. Additionally, pursuant to its own contracts, Dynamic Beacon irrevocably assigned client work product to its clients. Thus, Plaintiff lacks standing to bring claims concerning those files.

Even if a lack of standing were not fatal to Plaintiff's claims, several of those claims fail as a matter of law for additional reasons.

Plaintiff's Computer Fraud and Abuse Act ("CFAA") claim (Count II) fails because the U.S. Supreme Court has held that such claims do not lie where the defendant was authorized to access the files at issue – even if the defendant used that authorization for an improper purpose.

Plaintiff's trade secrets claims (Counts I and III) fail because the files at issue are publicly available, and thus not trade secrets. And, even if the files were trade secrets, Plaintiff did not reasonably protect those alleged trade secrets.

Plaintiff's conversion claim (Count VIII) fails with respect to any client work product because those files did not belong to Plaintiff. That claim also fails entirely because Plaintiff cannot demonstrate that it suffered any damages resulting from the alleged conversion.

Plaintiff's tortious interference with business relations claim (Count V) fails because the clients Defendants are alleged to have improperly convinced to transition from Dynamic Beacon to Agile did not know anything about any copying of files, and the one that did know about this allegation learned about it from Dynamic Beacon, not Defendants.

Finally, Plaintiff's claim for violation of M.G.L. c. 93, § 11 (Count VII) fails because the unfair or deceptive acts Plaintiff alleges did not occur primarily and substantially in Massachusetts. That claim also fails against Agile because Agile did not exist when the allegedly unfair or deceptive acts took place, and thus could not have participated in them.

The Court should, therefore, grant Defendants summary judgment on Plaintiff's claims.

## SUMMARY OF UNDISPUTED MATERIAL FACTS

In June 2004, Koller and, in January 2005, Brun began their employment with Plaintiff's predecessor, RR Moran, Ltd. ("RR Moran"), which owned Acton Toyota. SUMF ¶¶ 1-3.[1] On commencing employment, neither Brun nor Koller executed any non-competition, non-solicitation, or confidentiality agreements. Nor were either of them apprised of any confidentiality policies. SUMF ¶¶ 4-5.

Brun and Koller eventually worked in Acton Toyota's internet sales department. They achieved significant success there, and, through their efforts, Acton Toyota received national recognition for its digital marketing. SUMF ¶¶ 8-7. Desiring to build on that success, Brun and

---

[1] Citations to "SUMF" refer to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment.

Koller developed the idea to create an agency to provide digital marketing services to other automobile dealerships. In 2011, they brought their idea to Acton Toyota's leadership, which authorized them to establish Dynamic Beacon as a dealer-to-dealer digital marketing agency operating within and as a d/b/a of Acton Toyota. SUMF ¶¶ 8-10. Brun and Koller had full autonomy to run Dynamic Beacon. SUMF ¶ 11. At no point while at Dynamic Beacon were Brun or Koller subject to any restrictive covenants or confidentiality agreements. SUMF ¶¶ 12-14.

One of the services Dynamic Beacon offered was management of its clients' websites, including website design (and associated HTML coding), creation of custom images and ad copy, and search engine optimization ("SEO"). SUMF ¶ 15.[2] Dynamic Beacon also ensured that client websites complied with automobile manufacturers style requirements. SUMF ¶ 18.

Dynamic Beacon created HTML coding for client websites, consisting of an HTML framework, CSS stylesheets, and code snippets, which dictate how information is displayed on the website. SUMF ¶¶ 19-20. Dynamic Beacon built its framework, stylesheets, and other HTML website components and used code snippets from free open-source materials. SUMF ¶¶ 21-22. Dynamic Beacon also created graphics, ad copy, and HTML coding for email broadcasts, built from templates Dynamic Beacon created for its clients, sent through clients' customer relationship management platform ("CRM"). SUMF ¶¶ 23-24. And, Dynamic Beacon would coordinate with clients' SEM and other vendors to ensure a cohesive digital marketing strategy. SUMF ¶ 25.

Brun and Koller built up significant goodwill in the automobile industry, resulting in Dynamic Beacon's developing a strong roster of clients, including those at issue here. SUMF ¶¶ 26-27. Dealerships engaged Dynamic Beacon by entering into a standard form marketing

---

[2] SEO is the process of optimizing a website to appear higher in search engine (such as Google) results, which drives traffic to the website. Search engine marketing ("SEM") is purchasing paid advertisements that are displayed alongside search engine results. SUMF ¶¶ 16-17.

service agreement ("MSA"). SUMF ¶ 28. Under the MSAs, ███████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████ Exs. 14 – 23 § 7.

Dynamic Beacon primarily used three computer systems: Google Workspace, Asana, and MailChimp.[3] SUMF ¶ 42. Google Workspace is a collection of cloud-based applications. SUMF ¶ 45. One such application is Google Drive, which Dynamic Beacon used as its main storage for all files, including client Work Product. SUMF ¶¶ 46-47. ███████████████████

███████████████████████████████ SUMF ¶ 48.

Asana is a third-party collaboration and productivity application Dynamic Beacon used to track client projects and store related information such as project instructions and notes from clients. SUMF ¶¶ 49-50. ███████████████████████

███████████████████████████████ SUMF ¶¶ 51-52.

MailChimp is a third-party platform Dynamic Beacon used to store client and prospective client lists. SUMF ¶ 53. ███████████████████████████████

████████████████████████████████████████████ SUMF ¶ 55.

Dynamic Beacon employees did not enter into any confidentiality agreements. Other than the "CONFIDENTIAL" marking on MSAs, Dynamic Beacon also did not inform employees to keep any files confidential. SUMF ¶¶ 13-14, 56. Indeed, Dynamic Beacon employees were free to and did use files stored in Dynamic Beacon systems in their outside freelance work. SUMF ¶ 57.

Effective July 28, 2020, RR Moran and Koch Acton entered into a Dealership Asset Purchase Agreement (the "APA") whereby ███████████████████████████████

---

[3] Not relevant here, Dynamic Beacon also used Amazon Web Services ("AWS"), GoDaddy Premium Business Hosting with cPanel ("GoDaddy"), and WordPress, three third-party web hosting services designed to make information freely available on the internet. SUMF ¶¶ 43-44.

███████████████████████ Ex. 26. Neither Brun nor Koller became subject to any restrictive covenants or confidentiality agreements following the sale. SUMF ¶ 59.

Plaintiff abruptly shut down Acton Toyota's internet sales department, which accounted for about 30% of Acton Toyota's sales volume. SUMF ¶ 60. Brun and Koller became concerned that Plaintiff would, similarly, shut down Dynamic Beacon abruptly, causing clients significant disruption and potential loss of their Work Product. SUMF ¶ 61. Thus, to protect against any such disruption and ensure client Work Product was preserved and remained accessible, Koller exported copies of contact lists from Dynamic Beacon's MailChimp account and created a copy of Dynamic Beacon's Google Drive. He did this from his home in Vermont. SUMF ¶¶ 62-65.

By December 2020, it was clear Plaintiff was not interested in Dynamic Beacon. SUMF ¶ 66. During a December 4, 2020 meeting, Plaintiff's president, Kurt Koch, ordered Brun and Koller to focus on Acton Toyota, saying that he did not care how much money Dynamic Beacon made. SUMF ¶ 67. Koch decided to sell Dynamic Beacon to Market Masters Media Group ("MMMG") because "I'm in the car business and I want to focus on cars." SUMF ¶ 68.

In about December 2020, Brun and Koller began to consider resigning from Dynamic Beacon and forming a new digital marketing agency focused on automobile dealers. SUMF ¶ 69. By mid-January 2021, Brun and Koller's concerns about Dynamic Beacon's future had only grown. SUMF ¶ 70. Thus, on January 18, 2021, they tendered their resignations. SUMF ¶ 71. On January 22, 2021, having resigned and free of any restrictive covenants or confidentiality agreements, Brun and Koller formed Agile. SUMF ¶ 72. Brun and Koller also informed Dynamic Beacon clients of their resignations and asked them to consider retaining Agile to provide digital marketing services. SUMF ¶ 73. At no point in trying to convince a client to retain Agile did Brun or Koller ever mention any Dynamic Beacon files. SUMF ¶ 74. Several Dynamic Beacon clients

did, in fact, transition to Agile because of the relationships and goodwill Brun and Koller had built over the years. SUMF ¶ 75. Agile, Brun, and Koller (nor anyone employed by them) have never used any Dynamic Beacon files to solicit or provide services to clients. SUMF ¶ 76. Rather, Agile engaged freelance designers to serve its clients until about February 4, 2021, when Agile hired Christopher Luniewicz, a former Dynamic Beacon employee. SUMF ¶ 79.

## ARGUMENT

## I.    PLAINTIFF LACKS STANDING TO BRING ITS CLAIMS.

Plaintiff lacks standing to bring its claims for two reasons stemming from the requirement that a plaintiff "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). First, Plaintiff lacks standing because it did not acquire Dynamic Beacon. Second, Plaintiff lacks standing with respect to client Work Product because Dynamic Beacon irrevocably assigned that Work Product to its client.

Article III requires "that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019). Further, "[t]he party invoking federal jurisdiction bears the burden of establishing standing – and, at the summary judgment stage, such a party 'can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.''" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

A plaintiff must fulfill both constitutional and prudential requirements for standing. For constitutional standing, a plaintiff must prove that it has suffered an injury in fact, its injury is fairly traceable to the disputed conduct, and the relief sought promises to redress the injury

sustained. *Lujan,* 504 U.S. at 560–61. The U.S. Supreme Court has also developed prudential limitations to standing, including the general prohibition against a plaintiff raising another person's legal rights. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75(1982) (collecting cases); *Warth*, 422 U.S. at 499; *see Latin Am. Music Co. v. The Archdiocese of San Juan of Roman Cath. & Apostolic Church*, 499 F.3d 32, 46 (1st Cir. 2007) ("A question of who may assert an otherwise justiciable claim is a question of prudential standing"). Plaintiff lacks both constitutional and prudential standing.

### A. The APA and MSAs are Unambiguous.

There can be no credible dispute that the APA and MSAs are unambiguous and, thus, the construction of their terms is a matter of law for the Court. *See Farmers Ins. Exch. v. RNK, Inc.,* 632 F.3d 777, 783 (1st Cir. 2011). To determine that a contract is unambiguous, "the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Id.*; *Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008); *see also Barclays Bank PLC v. Poynter*, 710 F.3d 16, 21 (1st Cir. 2013). "Ambiguity is not created merely because the litigants disagree about the meaning of a contract." *Nicolaci v. Anapol,* 387 F.3d 21, 26 (1st Cir. 2004). Rather, "a contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Bank v. Int'l Bus. Machs. Corp.,* 145 F.3d 420, 424 (1st Cir. 1998) (internal quotations marks and citation omitted). In construing an unambiguous contract, a court may only rely on the contract's plain language, disregarding any extrinsic evidence. *Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC,* 16 F.4th 304, 308 (1st Cir. 2021).

Further, "[s]ummary judgment is appropriate when the contract's plain terms unambiguously favor either side." *Barclays Bank*, 710 F.3d at 21. Here, the APA and MSAs are unambiguous and plainly demonstrate that Plaintiff lacks standing.

**B.    Koch Action Did Not Purchase Dynamic Beacon.**

On or about July 28, 2020, RR Moran, as the "Seller," and Koch Acton, as the "Purchaser," executed the APA. Ex. 26 at 1. An express purpose of the APA was that ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Plaintiff did not acquire Dynamic Beacon and consequently does not have standing to assert any of its claims.

Because this sale involved only certain assets of Seller, it is essential to review the APA's definition of what assets were sold. ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ It is undeniable that the APA does not in any way reference Dynamic Beacon as an asset Plaintiff bought.

That Koch Acton did not purchase Dynamic Beacon is reinforced by the fact that █████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

The remainder of the APA concerns ██████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

Finally, to the extent Koch Acton claims that conveyance of Dynamic Beacon and/or the

MSAs were discussed in negotiations, the APA ████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

The plain terms of the APA provide that RR Moran did convey Dynamic Beacon to Koch Acton. Therefore, Plaintiff does not have standing to bring any of its claims.

### C.    The Clients Own All Materials Dynamic Beacon Created for Them.

Plaintiff claims that it owns client files, including client Work Product. Ex. 30 at 1 (identifying "the files and documents enumerated and described in the Affidavit of Bobby Kemp filed in conjunction with Plaintiff's Motion for Preliminary Injunction, and files located on Dynamic Beacon servers, hard drives and cloud storage as 'trade secret,' for purposes of M.G.L. c. 42D."); *id.* at 5-6 (listing "Client Files" among Plaintiff's alleged trade secrets); Ex. 27 at 5 (explaining that Dynamic Beacon's Google Drive is "where all [Dynamic Beacon's] client back-up is done" and that client files "includes all original files from webpage/email code to logo and print files."). Plaintiff also claims that email templates created for Dynamic Beacon clients are among its trade secrets. Ex. 30 at 6 (identifying "Email Template Files" bearing the name of Dynamic Beacon clients as trade secrets); SUMF ¶¶ 23-24 (explaining that Dynamic Beacon used these email templates to send marketing emails, created by Dynamic Beacon for a client, to a client's customers). On their face, based on Dynamic Beacon's MSAs with clients, these files do not belong to Dynamic Beacon, and therefore, cannot be Dynamic Beacon trade secrets.

Per the MSAs, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████ [4]

*See id*. Thus, client Work Product is not owned by Plaintiff, and Plaintiff lacks standing to pursue any claims related to client Work Product. *See, e.g.*, *Att'y Gen. v. Bodimetric Profiles*, 404 Mass. 152, 158 (1989) (defendant lacked standing to assert a third party's trade secrets rights); *Focused Impressions, Inc., v. Sourcing Group, LLC*, No. 19-cv-11307-ABD, 2020 WL 1892062, at *4 (D. Mass. Apr. 16, 2020) (ownership is an essential element of a trade secrets claim); *Foss v. Marvic*, 424 F. Supp. 3d 158, 161 (D. Mass. 2019) (conversion requires that "plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion"); *Cellect LLC v. Rogers Corp.*, No. CV 2009-11908-MLW, 2010 WL 11583110, at *2 (D. Mass. May 27, 2010) ("Obviously, in order to succeed on its state law claims, [the plaintiff] will have to prove that it owned the trade secrets . . . ."), *adopted by* 2010 WL 4909609 (D. Mass. Nov. 23, 2010).

## II.     THE CFAA ACT CLAIM FAILS AS A MATTER OF LAW.

Plaintiff alleges that Brun and Koller, trusted with access to Dynamic Beacon's computer systems, violated the CFAA (18 U.S.C. § 1030 et seq.) by accessing Dynamic Beacon's computer systems during their employment "solely to take Dynamic Beacon Trade Secrets for the purpose of benefiting themselves and competitors to the detriment of Dynamic Beacon." Ex. 32 ¶¶ 41-42.

The CFAA "makes it illegal 'to access a computer with authorization and to use such access to obtain or alter information in the computer **that the accesser is not entitled so to obtain or alter**." *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) (emphasis added). A CFAA claim requires proof of "unlawful information access" as opposed to "downstream information misuse." *Id*. at 1662. The CFAA " covers those who obtain information from particular areas in the computer – such as files, folders, or databases – **to which their computer access does not extend. It does**

---

[4] Plaintiff has not asserted that any clients at issue failed to pay for any work product.

**not cover those who, like Van Buren, have improper motives for obtaining information that is otherwise available to them**." *Van Buren*, 141 S. Ct. at 1652 (emphasis added).

While employed at Dynamic Beacon, Brun and Koller (and all Dynamic Beacon employees) had unfettered access to Dynamic Beacon's applications and files. SUMF ¶¶ 48, 51, 54. Further, Plaintiff only alleges that Brun and Koller accessed and copied Dynamic Beacon's data during their employment (i.e., when they were authorized to access that information). As held in *Van Buren*, a CFAA claim can only stand against someone who accesses electronic information they were not authorized to. The Court squarely rejected the notion that it is a CFAA violation simply to "us[e] a computer network in a way contrary to what your job or policy prohibits." *Id.* at 1653 (internal quotations omitted). As such, Plaintiff's CFAA claim fails as a matter of law.

III. <u>**THE TRADE SECRETS CLAIMS FAIL AS A MATTER OF LAW.**</u>

Plaintiff alleges trade secrets misappropriation under the Defend Trade Secrets Act, 18 U.S.C. §1836(b)(1) ("DTSA") and Massachusetts Uniform Trade Secrets Law, M.G.L. c. 93 §§ 42, 42A ("MUTSA"). *See* Ex. 32 ¶¶ 29-37, 47-55. Both DTSA and MUTSA require proof that: "1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007); *see also Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 386 F. Supp. 3d 89, 94–95 (D. Mass. 2019) (federal and state trade secret misappropriation elements are equivalent).

The undisputed facts demonstrate that no files Brun and Koller copied were trade secrets and, regardless, Dynamic Beacon failed to take reasonable steps to maintain those files' secrecy.

A. **None of the Files Brun and Koller Copied Are Trade Secrets.**

A trade secret is a "secret" that is "used in one's business" and "gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use" the secret. *Optos,*

*Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 238 (D. Mass. 2011) (quoting *J.T. Healy &*
*Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970)); *see Sensitech, Inc. v.*
*LimeStone FZE*, 581 F. Supp. 3d 342, 349 (D. Mass. 2022). The sine qua non of a trade secret is
secrecy: "[m]atters of public knowledge or of general knowledge in an industry cannot be
appropriated by one as his secret." *Optos, Inc.*, 777 F. Supp. 2d at 239 (quoting *J.T. Healy*, 357
Mass. at 736); *see Chiswick v. Constas*, No. 200400311, 18 Mass. L. Rptr. 104, 2004 WL 1895044,
at *3 (Mass. Super. Ct. June 17, 2004) ("if competitors could obtain the same information from a
third party, or the information is obtainable from publicly available sources," it is not trade secret).

 The files Brun and Koller copied are generally known and/or ascertainable by third parties
because the files are available on the internet. The Court recognized this early on in this case:

> I do not find a likelihood of success on the merits of the claims as to
> trade secrets or confidentiality . . . . The nature of the information,
> . . . essentially marketing materials and data and client lists, much of
> it is intended for public consumption or third-party consumption,
> whether dealers or prospective customers . . . . [I]t's in the nature of
> marketing materials that they are or intended to be public.

5/27/21 Prelim. Inj. Hr.'g Tr., at 22:20-23:5, ECF No. 56.

 Defendants' expert Giulio Amodeo reviewed Plaintiff's alleged trade secrets and
determined that nearly all the materials, including HTML coding and images, are currently
available on public websites. SUMF ¶ 86; Ex. 33 at 25-26. This is, of course, consistent with the
nature of Dynamic Beacon's business: it created content for client websites and marketing emails
that, as advertising, was designed to be made public. The Amodeo Report also notes that "most of
the data related to client websites in the Materials of Interest is several years old now," with only
21 files having been modified in 2018 or later. SUMF ¶ 87; Ex. 33 at 28; *id.* at 28 n.48.

 The Amodeo Report also addresses what appears to be the core of Plaintiff's trade secrets
argument: that Dynamic Beacon's website framework and stylesheets are trade secrets because

they are constructed to take advantage of SEO. Amodeo found almost every one of Dynamic Beacon's stylesheets and frameworks on a public internet source, most notably on Dynamic Beacon's own website. Ex. 33 at 29. The only files Amodeo was unable to find an identical or near-identical match for were a few development versions of the framework, meaning that the developer, Luniewicz, made incremental changes to versions of the framework as he was writing it. Ex. 33 at 32-33. However, the final version of the framework, the alleged trade secret, is freely available online. SUMF ¶ 88; Ex. 33 at 33.[5] Plaintiff's expert, Timothy Biron, does not dispute that Dynamic Beacon's frameworks and stylesheets are publicly available. Ex. 35 § 4.3.2. He simply concludes that fact "makes no difference to any claims to legitimacy of a site." *Id.* This observation has no bearing on whether the frameworks and stylesheets are trade secrets.

"Once a trade secret enters the public domain, the possessor's exclusive rights to the secret are lost," *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850 (1st Cir. 1985), and "once . . . lost, it is gone forever." *Touchpoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004) (citation omitted); *see also Religious Tech. Center v. Lerma*, 908 F. Supp. 1362, 1368 (E.D. Va. 1995) ("Once a trade secret is posted on the Internet, it is effectively part of the public domain, impossible to retrieve."). The alleged trade secrets are on the Internet, so they are not trade secrets.

### B.    Plaintiff Failed to Reasonably Protect Its Alleged Trade Secrets.

Plaintiff's trade secrets claims also fail because Plaintiff failed to take reasonable steps to protect its alleged trade secrets. *See Incase Inc.*, 488 F.3d at 52. "To determine whether a company took reasonable steps to protect its trade secrets, courts consider '1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances

---

[5] Dynamic Beacon's frameworks, stylesheets, and other HTML website components were built from free, publicly available, open-source materials, which the Amodeo Report confirmed. SUMF ¶¶ 21-22; Ex. 33 at 33-34.

under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable.'" *Optos, Inc.,* 777 F. Supp. 2d at 239–40 (quoting *TouchPoint Sols.,* 345 F. Supp. 2d at 29).

The Court, early on, saw that "there's no evidence that any of this information was closely guarded, that there were instructions to maintain its confidentiality. **At most, it was password protected, which is a basic feature of every computer system I think everywhere in the world**, and there was little, if any other confidentiality protection or instruction." 5/27/21 Prelim. Inj. Hr.'g Tr. at 23:6-12, ECF No. 56 (emphasis added). Discovery in this case has validated the Court's initial conclusion that Plaintiff did not reasonably protect its alleged trade secrets. Although courts call for "constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it," *J.T. Healy*, 357 Mass. at 738, Dynamic Beacon failed to implement *any* reasonable measures to protect its alleged trades secrets.

Restrictive covenants and/or confidentiality agreements are key trade secrets protections. *See id.* (finding no reasonable protections where the plaintiff did not forbid employees from discussing the process with others and employees did not sign non-disclosure agreements); *see also Mavel, a.s. v. Rye Dev., LLC*, No. CV 21-11759-FDS, 2022 WL 4084289, at *5–6 (D. Mass. Sept. 6, 2022) (collecting cases regarding the importance of confidentiality and non-disclosure agreements in reasonably protecting trade secrets). Brun and Koller, however, were never subject to any such agreements. Notably, Dynamic Beacon's Rule 30(b)(6) designee testified █████████ ████████████████████████. SUMF ¶ 85. Restrictive covenants and/or non-disclosure agreements protect trade secrets in employees' minds.

In fact, no one ever verbally warned Dynamic Beacon employees about the existence or protection of Dynamic Beacon's trade secrets. Rather, it was commonplace for Dynamic Beacon's designers to use Dynamic Beacon files to show case their skills on their own personal websites to generate freelance design work. SUMF ¶¶ 13-14, 56-57.

Dynamic Beacon also failed to implement key information security protections. 

SUMF ¶ 48. Reasonable protection of trade secrets requires more than a password and requires limiting access to the trade secrets only to those who must have access.

SUMF ¶¶ 51-52.

MailChimp was also inadequately protected.

SUMF ¶ 54.

At best, Dynamic Beacon protected its alleged trade secrets with passwords, which is insufficient for trade secrets because it is standard for all electronic information (trade secret and not). *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, No. CIV.A. 7866-VCP, 2014 WL 897223, at *16 (Del. Ch. Mar. 5, 2014) ("I am not persuaded that merely password protecting the . . . information at issue here constitutes reasonable efforts to protect the confidentiality of that information. Wayman has not presented evidence that it conveyed to those . . . [with access] that the . . . information was highly confidential or secret.").

Plaintiff's expert responds that, while "all businesses should be following cyber security practices such as those outlined [in the Amodeo Report], [ ] it is unrealistic in this scenario with no IT administrator to expect [Dynamic Beacon] to know and apply them." Ex. 35 § 4.2. A supposed lack of resources or personnel does not relieve the obligation to implement reasonable

trade secret protections.[6] It was incumbent on Plaintiff to do *something* to protect its alleged trade secrets, but it did nothing. As a result, Plaintiff's trade secrets claims fail as a matter of law.

## IV.  THE CONVERSION CLAIM FAILS AS A MATTER OF LAW.

Conversion requires showing "that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993) (applying Massachusetts law). Plaintiff's conversion claim fails because Plaintiff does not own client Work Product and it cannot prove damages as a result of the alleged conversion.

### A.  Plaintiff Does Not Own Client Work Product.

Plaintiff must demonstrate that it owns the files allegedly converted. *See Foss*, 424 F. Supp. 3d at 161. As discussed, the clients own client Work Product. Plaintiff, therefore, cannot prove conversion for any such files.

### B.  Plaintiff Cannot Prove It Was Harmed by Defendants' Alleged Conversion.

Plaintiff must prove that it suffered a permanent loss of property or a monetary loss. *Turner v. Hubbard Sys., Inc.*, 153 F. Supp. 3d 493, 494–95 (D. Mass. 2015) (citing *In re Computer Eng'g Assocs., Inc.*, 278 B.R. 665, 682 (D. Mass. 2002), *aff'd*, 337 F.3d 38 (1st Cir. 2003) (damages are an "essential element of a claim for conversion"); *see Carmona v. Toledo,* 215 F.3d 124, 133 (1st Cir. 2000) ("Courts are rightfully cautious about requiring a defendant to effectively 'prove a

---

[6] Moreover, according to Plaintiff, Dynamic Beacon was and is a d/b/a of a large car dealership worth tens of millions of dollars. If Dynamic Beacon had trade secrets to protect, it had the resources to do so and its election not to utilize those resources cannot save its claims.

negative' in order to avoid trial on a specious claim. Thus, if the summary judgment record satisfactorily demonstrates that the plaintiff's case is, and may be expected to remain, deficient in vital evidentiary support, this may suffice to show that the movant has met its initial burden.").

Plaintiff cannot prove that Defendants' copying Dynamic Beacon files caused it harm, and the damages cannot be based on speculation. *See World Wide Video, LLC v. Pagola,* No. CV 08-10391-RWZ, 2009 WL 10693580, at *2 (D. Mass. Oct. 8, 2009). Because Defendants *copied* Dynamic Beacon's files, Plaintiff cannot show permanent loss. Additionally, Plaintiff has no evidence that Defendants used any files copied from Dynamic Beacon – even after a Court-ordered forensic audit – because the Defendants did not use those files. SUMF ¶ 76. Plaintiff's conversion claim necessarily fails.

### C. Defendants Cannot Be Liable on Plaintiff's Conversion Claim for Files on Luniewicz's Hard Drive.

Plaintiff claims that files on a hard drive maintained by Luniewicz were trade secrets, and it will likely argue that those files were converted.[7] As the Amodeo Report sets forth, the contents of that hard drive contain older files, with only 21 of the 23,631 files having a "Last Modified" date of 2018 or later. SUMF ¶ 21; Ex. 33 at 28, 28 n.48. This means that Luniewicz saved these files years before Agile ever existed. Additionally, the undisputed facts demonstrate that Defendants were not aware of the hard drive until September 2021. SUMF ¶ 81. Defendants cannot be liable for years-old acts of which they had no knowledge.

### V. THE TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW.

Plaintiff's tortious interference claim fails because it cannot show that Defendants' conduct induced any client to terminate its relationship with Dynamic Beacon. To prove tortious

---

[7] Defendants, of course, dispute this contention.

interference, Plaintiff must show that (1) it had a business relationship or contemplated contract of economic benefit; (2) Defendants knew of that relationship; (3) Defendants interfered with that relationship "through improper means or motive"; and (4) Plaintiff's loss was a direct result of Defendant's conduct. *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 47 (1st Cir. 2002). Critical to this claim, Plaintiff must prove that Defendants' allegedly improper interference *caused* clients to terminate their relationship with Dynamic Beacon. *See Med. Air Tech. Corp. v. Marwan Inv., Inc.*, 303 F.3d 11, 22 (1st Cir. 2002).

Plaintiff alleges that "Defendants interfered with and negatively impacted Plaintiff's business relationships by stealing its trade secrets for their own benefit and the benefit of Plaintiff's competitors." Ex. 32 ¶ 68. However, in soliciting clients for Agile,[8] neither Brun nor Koller ever mentioned any Dynamic Beacon files. SUMF ¶¶ 74, 76. Indeed, all but one of the clients did not know of any allegation that Brun and Koller had copied Dynamic Beacon files, and the one who did learned that information from Dynamic Beacon, not Defendants. Clients transitioned to Agile because they wanted to work with Brun and Koller and, in some cases, because they found Dynamic Beacon's new management distasteful. SUMF ¶ 77-78; *see also* Ex. 9 ¶¶ 12-14, Ex. 11 ¶¶ 13-15, 17; Ex. 13 ¶¶ 13-15, 18. There is no causal connection between copying Dynamic Beacon files and clients terminating their relationships with Dynamic Beacon, so the tortious interference claim fails.

## VI.    THE CHAPTER 93A CLAIM FAILS AS A MATTER OF LAW.

A M.G.L. c. 93, § 11 claim fails "unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." M.G.L. c. 93A, § 11. A Section 11 claim requires

---

[8] With no restrictive covenants, Brun and Koller could solicit Dynamic Beacon clients.

that "the center of gravity of the circumstances that give rise to the claim" is within Massachusetts. *Kuwaiti Danish Comput. Corp. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799 (Mass. 2003). Plaintiff alleges that the unfair or deceptive acts Defendants engaged in are "immediately prior to their departure from Plaintiff . . . unlawfully access and copying Dynamic Beacon Trade Secrets with the intent to misappropriate Plaintiffs' confidential information" and "completely wip[ing] their Dynamic Beacon issued computers in an attempt to conceal and deceive Plaintiff." Ex. 32 ¶¶ 76-77. Even assuming, arguendo, that the "wiping" of the laptops took place in Massachusetts – a fact for which Plaintiff has no evidence – it is undisputed that the "access[ing] and copying" of Dynamic Beacon files, particularly Google Drive and MailChimp, happened in *Vermont*. SUMF ¶¶ 63, 65. The "center of gravity" of the alleged Chapter 93A violations is in Vermont – not Massachusetts – so, Plaintiff's Chapter 93A claim fails.

Plaintiff's Chapter 93A claims against Agile fails for an additional reason. Plaintiff alleges that the "access[ing] and copying" of Dynamic Beacon files occurred "immediately prior to [Brun and Koller's] departure from Plaintiff." Ex. 32 ¶ 76. Plaintiff also asserts that Brun and Koller returned their Dynamic Beacon laptops on January 18, 2021, when they resigned, and that, thereafter Plaintiff "discovered [Brun and Koller] had 'wiped' the files." Ex. 32 ¶¶ 9-10. Logically, if Brun and Koller "wiped" their laptops as Plaintiff asserts, they must have done so on or before January 18, 2021. Agile was not formed until January 22, 2021. Thus, Agile could not have participated in the alleged unfair or deceptive acts, and the Chapter 93A claim against Agile fails.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in Defendants' favor and against Plaintiff on all Plaintiff's claims.

Respectfully submitted,

JUSTIN BRUN, BENJAMIN KOLLER, AND
AGILE CREATIVE SOLUTIONS, LLC,

By their attorneys,

*/s/ Michael Thompson*
Michael Thompson, BBO #673497
Colin J. F. Edge, BBO #696950
PRINCE LOBEL TYE LLP
One International Place
Suite 3700
Boston, MA 02110-3536
Telephone: (617) 456-8000
Facsimile: (617) 456-8100
mthompson@princelobel.com
cedge@princelobel.com

Dated: June 9, 2023

## **CERTIFICATE OF SERVICE**

       I hereby certify that on this 9th day of June, 2023, I caused a true copy of the foregoing to

be served via electronic mail to counsel of record as follows:

Rachel Moynihan
FisherBroyles, LLP
75 State Street, Suite 100
PMB 4418
Boston, MA 02109
rachel.moynihan@fisherbroyles.com

Dated: June 9, 2023                                       */s/Colin J. F. Edge*_____
                                                Colin J. F. Edge, BBO #696950