**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                          )
KOCH ACTON, INC., d/b/a DYNAMIC           )
BEACON,                                   )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )        Civil Action No.
                                          )        21-10374-FDS
BENJAMIN KOLLER, JUSTIN BRUN,             )
and AGILE CREATIVE                        )
SOLUTIONS, LLC,                           )
                                          )
          Defendants.                     )
_____ )
```

**MEMORANDUM AND ORDER ON CROSS-MOTIONS**
**<u>FOR SUMMARY JUDGMENT</u>**

**SAYLOR, C.J.**

This is a case concerning the appropriation of allegedly confidential and proprietary information of a digital-marketing agency by two of its former employees.

Benjamin Koller and Justin Brun were hired by RR Moran, Ltd. in June 2004 and January 2005, respectively. RR Moran owned Acton Toyota, an automobile dealership in Littleton, Massachusetts. Koller and Brun began working in Acton Toyota's internet sales department. After several years, they helped to establish a dealer-to-dealer digital-marketing agency called Dynamic Beacon.

Dynamic Beacon was not separately organized, but simply was a group of individuals operating out of the Acton Toyota dealership. It served clients, including other dealerships, by creating and coordinating digital-marketing strategies.

In October 2020, Koch Acton, Inc. purchased the assets of Acton Toyota pursuant to an

asset-purchase agreement.  According to Koch Acton, after the sale, Koller and Brun downloaded copies of files of Dynamic Beacon to their own accounts.  On January 18, 2021, they resigned from the company.

Some days later, Koller and Brun formed Agile Creative Solutions, LLC.  Agile is a marketing organization operating within another automobile dealership that also provides digital-marketing services.  Koller and Brun allegedly used the downloaded files of Dynamic Beacon to launch and operate Agile.

Plaintiff Koch Acton, Inc. has filed suit against Koller, Brun, and Agile, alleging misappropriation of trade secrets and a variety of related claims.  It seeks damages, fees, and costs, and an injunction against access and use of its confidential information.

Defendants have moved for summary judgment on all counts on the basis of standing and on certain additional counts as a matter of law.  Plaintiff has cross-moved for summary judgment on all counts.

For the reasons set forth below, defendants' motion will be granted in part and denied in part, and plaintiff's motion will be denied.

## I.    <u>Background</u>

### A.    <u>Factual Background</u>

The following facts are as set forth in the record and are undisputed except as noted.

Benjamin Koller and Justin Brun were hired by RR Moran, Ltd. in June 2004 and January 2005, respectively.  (Plaintiff's Response to Defendants' Statement of Material Facts, ECF No. 147 ("Defs.' SMF") ¶¶ 1-2).  RR Moran owned an automobile dealership, Acton Toyota, where Koller and Brun eventually began working in its internet sales department.  (*Id.* ¶¶ 3, 6).

While in the sales department, Koller and Brun developed the idea of creating an agency

to provide digital-marketing services to other automobile dealerships. (*Id.* ¶ 8). They presented that idea to Acton Toyota's leadership in 2011 and were authorized to establish "Dynamic Beacon," a dealer-to-dealer digital-marketing agency. Dynamic Beacon was not separately organized, but was a d/b/a of Acton Toyota. (*Id.* ¶¶ 9-10).

Koller and Brun were given autonomy to run all aspects of the operations of Dynamic Beacon. (*Id.* ¶ 11). They were not subject to any restrictive covenants or confidentiality agreements during their tenure. (*Id.* ¶ 12).

Other automobile dealerships engaged Dynamic Beacon by entering into a standard-form marketing services agreement ("MSA"). (*Id.* ¶ 28).[1] Dynamic Beacon offered clients website management, including website design, creation of custom images and ad copy, and search-engine optimization. (*Id.* ¶ 15). It would make efforts to ensure that client websites complied with automobile manufacturers style requirements, and created HTML frameworks, CSS stylesheets, and code snippets that helped dictate how information would be displayed. (*Id.* ¶¶ 18-20).[2] It also created graphics, ad copy and HTML coding for clients' e-mail broadcasts sent through the clients' customer-relationship management platform. (*Id.* ¶ 23). Dynamic Beacon was successful, and developed a substantial roster of automobile-dealership clients. (*Id.* ¶ 26).

Effective July 28, 2020, RR Moran, Ltd. and Robert R. Moran sold the assets of Acton Toyota to Koch Acton, Inc. pursuant to a Dealership Asset Purchase Agreement. (*Id.* ¶ 58).[3]

---

[1] Exhibit 14 of the Joint Appendix is a copy of Dynamic Beacon's standard-form MSA. (*Id.* ¶ 29).

[2] Stylesheets are used to style anything that is used on the internet. (Pl.'s SMF ¶ 28). Frameworks are similar to the "bones" or "two-by-fours" of a house, while stylesheets make websites more attractive. (*Id.* ¶ 23). Plaintiff asserts that defendants downloaded frameworks and stylesheets from Dynamic Beacon's GoDaddy Server. Defendants dispute that assertion, and contend that the frameworks and stylesheets at issue are available on the internet. (*Id.* ¶ 21).

[3] Exhibit 26 of the Joint Appendix is a copy of the Dealership Asset Purchase Agreement. (*Id.* ¶ 58).

Koch Acton then began operating the dealership.  (*Id.* ¶ 89; Joint App'x Ex. 2 at 97-98;

Plaintiff's Statement of Facts and Defendants' Responses, ECF No. 149 ("Pl.'s SMF") ¶ 1)

At some point, Koch transferred management of Dynamic Beacon to its advertising

agency, Market Masters Media.  (Pl.'s SMF ¶ 7).  Eventually, Koch decided to sell Dynamic

Beacon to Market Masters Media Group ("MMMG"), although that transaction apparently has

not been completed.  (Defs.' SMF ¶ 68).

While Koller and Brun were employed at Acton Toyota, Dynamic Beacon used three

primary computer platforms (Google Workspace, Asana, and Mailchimp) as well as other third-

party applications, such as Amazon Web Services, GoDaddy Premium Business Hosting with

cPanel, and WordPress.  (*Id.* ¶¶ 42-43).  Dynamic Beacon used Google Drive as its main storage

for all files, including client work product.  (Pl.'s SMF ¶ 80).  The Google Drive account housed

the Dynamic Beacon Graphic Designer account and clients' back up files, including original art,

website code, file-to-logo files, and e-mails.  (*Id.* ¶ 31).  It was utilized daily by Dynamic Beacon

web designers.  (*Id.*).  It also included design files, images, and fonts that were not client-

specific.  (*Id.* ¶ 39).  Asana is a third-party collaboration and productivity application that

Dynamic Beacon used as a project management tool to track client projects and store related

information such as project instructions and notes from clients.  (*Id.* ¶ 20).  MailChimp is an e-

mail marketing service used to communicate with clients.  E-mails would be sent to different

audiences for a variety of reasons, including prospecting, billing updates, and tips for current

clients.  (*Id.* ¶ 35).

All Dynamic Beacon employees had login credentials and access to its Google Drive.

(Defs.' SMF ¶ 48).  They could also access Asana through their Google Workspace accounts,

and could login to Mailchimp with a global login and password that was stored on Google Drive.

(*Id.* ¶¶ 48, 51, 54, 55).  It is undisputed that if someone were to combine the Asana files, frameworks, stylesheets, and Google Drive backup files, they would have enough information to provide full service to a client in an automotive agency capacity.  (Pl.'s SMF ¶ 31).[4]  They could also begin creating new content more quickly than if starting from scratch.  (*Id.* ¶ 27).

On November 30, 2020, from his home in Vermont, Koller downloaded contact lists from Mailchimp.  (Defs.' SMF ¶ 65, Pl.'s SMF ¶ 34).  On January 11 and 15, 2021, also from Vermont, he downloaded copies from Dynamic Beacon's Google Drive.  (Defs.' SMF ¶ 63; Joint App'x Ex. 27 at 5; Pl.'s SMF ¶¶ 29-30).  On January 17, 2021, Brun downloaded eleven files from Asana.  (Pl.'s SMF ¶ 19).

None of those downloads was authorized by Koch Acton.  (*Id.* ¶ 49).  Brun contends that he downloaded Asana project task lists because he was concerned that Koch Acton might shut down Dynamic Beacon and the client work product would be lost.  (*Id.* ¶ 101).

On January 18, 2021, Koller and Brun resigned from their positions.  (Defs.' SMF ¶ 71). They reset their Dynamic Beacon laptops to the initial factory settings (that is, with all user content deleted) and returned them to Koch Acton.  (Pl.'s SMF ¶ 8).

On January 22, 2021, Koller and Brun formed Agile Creative Solutions, LLC, a new marketing organization that services automobile dealerships.  (Defs.' SMF ¶ 72; Pl.'s SMF ¶ 12). Agile's administrative costs were supported by another dealership, Acton Lincoln Mercury, Inc., in exchange for a percentage of its revenues.  (Pl.'s SMF ¶¶ 10-13).

Koller and Brun informed Dynamic Beacon clients of their resignations and asked them to consider retaining Agile to provide digital-marketing services.  (Defs.' SMF ¶ 73).  At least

---

[4] According to Koch Acton, framework and stylesheet files would make it relatively simple to replicate the Dynamic Beacon web model in a short period of time, because the files have been created and tested over seven years.  (Pl.'s SMF ¶ 26).

several clients transitioned their business from Dynamic Beacon to Agile.  (Pl.'s SMF ¶¶ 57,

112).  Because neither Brun nor Koller are digital or graphic designers, they hired freelance

designers to serve Agile's clients until February 4, 2021, when they hired Christopher

Luniewicz, a former Dynamic Beacon employee.  (Pl.'s SMF ¶ 56; Defs.' SMF ¶ 79).

On February 10, 2021, the user AgileCreativeSolutions joined github.com.  (Pl.'s SMF ¶

43).  Agile uses a service, github.io, which is related to github.com, that permits tracking of the

creation of open-source coding.  (*Id.* ¶ 42).  One of its main functions is to keep a history of

changes to source code, such as when and by whom changes were made.  (*Id.*).  Between

February 10 and 24, 2021, AgileCreativeSolutions created 10 public repositories, including ones

titled "framework" and "toyota-oem."  (*Id.* ¶ 43).  Based on the change history, the first

significant code changes occurred on February 10, 2021.  (*Id.* ¶ 44).  For "framework," the

change was 5,525 new lines of code for the v1.css file.  (*Id.*).  For "toyota-oem," the change was

207 new lines of code for the generic-toyota file.  (*Id.*).

It is undisputed that while open-source code is available on the internet, it needs to be

researched and tested before it can be considered viable for use by a client, and therefore cutting

and pasting from the internet is not sufficient and will not produce an acceptable product.  (*Id.* ¶

46).  That is, copying code from the back end of web sites does not yield a finished client

product.  (*Id.* ¶ 47).  The code must work across multiple different dealership website platforms

and work simultaneously without issue; that was the job of the digital designer at Dynamic

Beacon.  (*Id.* ¶ 48).  The parties dispute whether Dynamic Beacon's stylesheets and frameworks

were copied, and, if so, whether they were copied from the Dynamic Beacon server.  (*Id.* ¶ 21).

**B.**   **Procedural Background**

On March 5, 2021, Koch Acton, Inc. d/b/a Dynamic Beacon filed a complaint against

Koller and Brun.  The complaint asserted seven causes of action:  (1) violation of the Defend

Trade Secrets Act, 18 U.S.C. § 1836(b)(1) ("DTSA"); (2) violation of the Computer Fraud and

Abuse Act, 18 U.S.C. § 1030 ("CFAA"); (3) misappropriation and violation of the

Massachusetts Uniform Trade Secrets Law, Mass. Gen. Laws ch. 93, §§ 42, 42A ("MUTSA");

(4) breach of the duty of loyalty; (5) tortious inference with business relations; (6) unjust

enrichment; and (7) violation of Mass. Gen. Laws ch. 93A, § 11.  The complaint has since been

amended to add a claim for conversion and to add Agile Creative Solutions, LLC as a defendant.

Defendants have moved for summary judgment on all counts for lack of standing and

also as to the following specific counts:  violation of the DTSA (Count 1); violation of the CFAA

(Count 2); misappropriation and violation of the MUTSA (Count 3); tortious interference with

business relations (Count 5); violation of Chapter 93A (Count 7); and conversion (Count 8).

Plaintiff has cross-moved for summary judgment, seeking entry of judgment against

defendants on all counts.

## II.    Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

Summary judgment is appropriate when the moving party shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence,

viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve

the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8

(1st Cir. 1990) (internal citation omitted).  When evaluating a summary-judgment motion, the

court makes all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*,

994 F.2d 905, 907 (1st Cir. 1993).  "[W]hen a properly supported motion for summary judgment

is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### III.   Analysis

#### A.   Defendants' Motion for Summary Judgment as to Standing

Defendants assert that plaintiff lacks standing to bring its claims on the ground that it did not acquire Dynamic Beacon when it acquired the assets of Acton Toyota.  They also assert that plaintiff lacks standing as to claims arising from client work product because Dynamic Beacon had irrevocably assigned that work product to the clients.

Article III limits the jurisdiction of the federal courts to actual cases or controversies. U.S. Const. art. III, § 2; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). Accordingly, a plaintiff in federal court must "establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).  The standing doctrine serves to identify those disputes that are "appropriately resolved through the judicial process." *Lujan*, 504 U.S. at 560 (quotations and internal citations omitted).

Standing has both a constitutional and a prudential component.  Constitutional standing requires proof of three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (quotations and internal citations omitted).

Prudential standing "encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Elk Grove*, 542 U.S. at 12 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  In cases in which a party "has been accorded a procedural right to protect his concrete interests, the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (quoting *Lujan*, 504 U.S. at 572 n.7).

Here, defendants' standing argument is predicated on two contracts:  the APA and the MSA.  They contend that each contract is unambiguous and clearly demonstrates that plaintiff lacks standing because it never owned Dynamic Beacon or the client work product.

If a contract is unambiguous, a court must interpret it in accordance with its ordinary and plain meaning.  *See Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998).  An agreement is not ambiguous merely because "a controversy exists between the parties, each favoring an interpretation contrary to the other," or because a word has multiple dictionary definitions.  *Id.* Rather, a provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  *Id.*; *see also Kelly v. Dimeo, Inc.*, 31 Mass. App. Ct. 626, 629 (1991).  The determination of whether a contract is unambiguous is a question of law for the court.  *Bank v. Thermo Elemental, Inc.*, 451 Mass. 638, 648 (2008).

If, on the other hand, a contract is ambiguous, the court may look to extrinsic evidence.

*Samia Cos. LLC v. MRI Software LLC*, 898 F. Supp. 2d 326, 335-36 (D. Mass. 2012) (quoting

*President & Fellows of Harvard Coll. v. PECO Energy Co.*, 57 Mass. App. Ct. 888, 896 (2003)).

"[A] contract is only ambiguous where an agreement's terms are inconsistent on their face or

where the phraseology can support reasonable differences of opinion as to the meaning of the

words employed and obligations undertaken." *Bank v. International Bus. Machs. Corp.*, 145

F.3d 420, 424 (1st Cir. 1998).  Ordinarily, ambiguities in contract language present questions of

fact for the jury.  *See Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995); *New

York Marine & General Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010).

### 1.   APA

Defendants contend that Koch did not purchase Dynamic Beacon when it acquired the

assets of Action Toyota.  The APA, which is the relevant contract, includes the following

provision:

> Subject to the terms and conditions of this Agreement, Seller agrees to sell and
> deliver to Purchaser, and Purchaser agrees to purchase and receive from Seller the
> assets, property rights, and interests, tangible and intangible, of the Dealership
> including, without limitation, those specifically described below ("Assets"), all of
> which are presently being used in the operation of the Dealership, for the purpose
> of succeeding the Seller as the authorized Manufacturer dealer at the Dealership
> Location.

(Joint App'x Ex. 26 at 1).  Certain "Assets" are specifically identified in the agreement.  (*Id*. at 1-

4).  Those listed assets include, among other things, "all goodwill of the Seller related to the

Dealership"; all "sales and service files, parts records and customer lists and all other

information and documents which are necessary and/or which might be useful in the furtherance

of the Dealership business"; and "all tradenames or service names used in the Dealership

business [and] all Internet domain names and [tele]phone numbers of the Dealership."  (*Id*. at 3).

The APA does not specifically list the Dynamic Beacon business as an asset.  Because it

does not, defendants contend that the contract therefore unambiguously provides that Koch

Action did not purchase those assets (and thus lacks standing to bring a claim for their misappropriation).  That argument, however, interprets the contract exactly backward.

Under the APA, Koch Acton purchased *all* of the assets of the dealership, including, "without limitation," the specifically listed assets.  The phrase "without limitation" cannot be read out of the contract, and certainly it cannot be reasonably interpreted to mean its polar opposite ("limited only to").

Furthermore, the "assets, property rights, and interests" of the dealership unquestionably included those of Dynamic Beacon.  Dynamic Beacon was merely a trade name used by the dealership for a particular line of business.  *See Roberts v. Delta Air Lines, Inc.*, 2008 WL 5156654, at *2 n.3 (D. Mass. Dec. 4, 2008), *aff'd* 599 F.3d 73 (1st Cir. 2010) ("The designation 'd/b/a' typically describes an entity's efforts to conduct business under another name (an alias), rather than describing a separate legal entity").  It was not separately incorporated or organized at the time of formation, nor is there any indication it was separately incorporated or organized at the time of the sale.  To the extent that Dynamic Beacon had assets, they were dealership assets.  To the extent the business was capitalized, it was with the funds of the dealership.  To the extent it was profitable, the profits accrued to the dealership.

In short, the assets purchased by Acton Toyota included all of the assets of Dynamic Beacon, in whatever form.  The assets of Dynamic Beacon were not left behind in some kind of business limbo, abandoned by the seller and not acquired by the purchaser.  They were acquired by Koch Acton, which has standing to assert claims for their misappropriation.

### 2.    MSA

Defendants further contend that because under the various MSAs Dynamic Beacon assigns ownership of client work product to the clients, Koch Action lacks standing to pursue any claims related to that product.  (Defs.' Mem. at 11).  The relevant section of the form MSA

used by Dynamic Beacon to contract with clients reads as follows:

> Intellectual Property; Assignment of Rights.  All original materials including original:  graphics, artwork source code, text, photos and all other original content created by Vendor on behalf of Client in the course of providing the Services ("Work Product") shall belong exclusively to Vendor until such time that Client pays Vendor for the relevant Services and the Work Product.  Vendor agrees to assign, and hereby does assign all right, title and interest in and to such Work Product to Client, effective upon payment for Services as provided in this Agreement.

(Joint App'x Ex. 14).

Notwithstanding that provision, another portion of the agreement states that "Vendor expressly reserves the right, and Client acknowledges and agrees that Vendor will provide similar services to other clients and may provide similar (but not identical) content and work product to other clients and such action(s) will not constitute a breach."  (*Id.*).  The section also states that the clients "expressly grant[] to Vendor a non-royalty bearing right and license, in perpetuity, to use, reproduce, display and create derivative works from any original intellectual property incorporated into any Work Product assigned . . . as long as all such use is for portfolio maintenance purposes only and is not re-sold or repurposed commercially."  (*Id.*).

Defendants contend that the MSAs unambiguously assign ownership of client work product to the clients, and that therefore those assets do not belong to Dynamic Beacon or plaintiff.  As a consequence, they contend, plaintiff lacks standing to pursue any claims related to that product.  (Defs.' Mem. at 11).

Plaintiff contends that the MSAs effectively constitute subscription agreements that assign limited use of Dynamic Beacon's intellectual property only when the client pays a fee.  It also asserts that "[t]he proprietary information at issue in this case are the actual files and repository of stored information within Dynamic Beacon's Google Drive, Asana system, and Mailchimp program which are used to operate the business."  (Pl.'s Opp. at 4-5).

It is true that the contract unambiguously provides that clients, rather than Dynamic Beacon, own client work product.  Nonetheless, it is far from clear whether all of the materials at issue here fall into that category.  For example, it is unclear if a client's full Asana file would constitute "original materials including original:  graphics, artwork source code, text, photos and all other original content created by Vendor on behalf of Client in the course of providing the Services."  Asana is a third-party application, and therefore using tools within it to manage product workflow might not constitute "original materials."  (*See* Defs.' SMF ¶ 49; Joint App'x Ex. 27 at 3).  Similarly, the frameworks and style sheets hosted on a Dynamic Beacon GoDaddy server, including generically named "db-framework" files and "generic-ford.css," are not obviously work product owned by any one client.  (Joint App'x Ex. 27 at 4).  That is particularly true because the clients acknowledge and agree in the MSAs that Dynamic Beacon may provide similar content and work product to other clients.  (Joint App'x Ex. 14).  The Google Drive files—"where all our client back-up is done . . . includ[ing] all original files from webpage/e[-]mail code to logo and print files"—appear to qualify as client work product as defined in the MSA at least in part, but it is also possible that plaintiff has some possessory interest in some of those same files.

That does not end the inquiry, as "[t]he standing inquiry is claim-specific:  a plaintiff must have standing to bring each and every claim that she asserts." *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (citing *Pagán v. Calderón*, 448 F.3d 16, 26 (1st Cir. 2006)).  Of the eight counts in this case, defendants have indicated only two—the federal and state-law claims for misappropriation of trade secrets—that require that the underlying property be owned, as opposed to merely possessed.[5]  Therefore, even if certain of the files at issue are not owned by

---

[5] While defendants assert that plaintiff lacks standing as to claims involving client work product generally, they cite caselaw concerning only the claims for misappropriation of trade secrets and conversion.  (Defs.' Mem. at

Dynamic Beacon, that would not necessarily preclude standing for the majority of the claims.

In summary, while it is clear that client work product is owned by the clients, rather than Dynamic Beacon, there is a material dispute as to whether the particular files at issue constitute client work product, in whole or in part.  (*See* Defs.' SMF ¶ 91; Defs.' Reply Mem. at 4 (characterizing same)).  Under the circumstances, plaintiff has standing to assert its claims as to the materials at issue.

**B.**   **Cross-Motions for Summary Judgment as to the Claims for Violation of the DTSA (Count 1) and MUTSA (Count 3)**

The parties have cross-moved for summary judgment as to the claims for misappropriation of trade secrets in violation of the DTSA and the MUTSA.  Both parties agree that the elements of the federal and state trade-secret claims are essentially equivalent.  (*See* Defs.' Mem. at 12; Pl.'s Mem. at 11).  *See Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 189 (1st Cir. 2023) (evaluating arguments under DTSA and Massachusetts common law concurrently).

The DTSA creates a private right of action for the "owner of a trade secret that is misappropriated."  *See* 18 U.S.C. § 1836(b)(1).  It defines "trade secret" broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information."  18 U.S.C. § 1839(3).  For the information to qualify as a trade secret, the owner must take "reasonable measures to keep such information secret," and the information must "derive[ ] independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means."  18 U.S.C. § 1839(3)(A)-(B).

---

11).  As to conversion, even the cases upon which they rely state that conversion requires that "plaintiff had an ownership *or possessory interest* in the property at the time of the alleged conversion."  (*Id.* (citing *Foss v. Marvic*, 424 F. Supp. 3d 158, 161 (D. Mass. 2019) (emphasis added))).

Similarly, Massachusetts law defines trade secrets to include "compilation[s] of information which [are] used in one's business, and which give[ ] him an opportunity to obtain an advantage over competitors who do not know or use it." *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 n.2 (1st Cir. 1985) (quoting *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970)).  A MUTSA misappropriation claim requires "1) the existence of a trade secret; 2) reasonable steps taken by the plaintiff to preserve the secrecy of its trade secret; and 3) the defendant's use of improper means in breach of its confidential relationship with the plaintiff." *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 158 (D. Mass. 2023); Mass. Gen. Laws ch. 93, § 42(2).

In evaluating whether a piece of information is a trade secret, the SJC and the First Circuit have considered the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Allstate Ins. Co.*, 79 F.4th at 188 (quoting *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972)); *see also* Mass. Gen. Laws ch. 93, § 42(4).

Defendants contend that none of the files that Koller and Brun copied included trade secrets, and that in any event Dynamic Beacon failed to take reasonable steps to maintain the secrecy of those files.  The four groupings of the files at issue upon which the parties appear to agree are Asana files, the frameworks and stylesheets, Google Drive files, and Mailchimp files. (*See* Defs.' SMF ¶ 91 (Plaintiff's Statement of Additional Facts); Defs.' Reply Mem. at 4

(characterizing same)).[6]  Without deciding whether each of the files at issue meet the other criteria, the undisputed evidence shows that none of those groups of files was reasonably protected as trade secrets under the circumstances.

The factors relevant to assessing whether a company took reasonable steps to protect trade secrets include "1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable." *Allstate Ins. Co.*, 79 F.4th at 192 (quoting *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 29 (D. Mass. 2004)).

It is undisputed that neither Brun nor Koller executed any non-competition, non-solicitation, or confidentiality agreements when they began their employment with RR Moran, nor were they apprised of any confidentiality policies at any point during their employment. (Defs.' SMF ¶¶ 4-5).  Neither Brun nor Koller were subject to any restrictive covenants or confidentiality agreements.  (*Id.* ¶ 12).  Moreover, Dynamic Beacon did not require employees in general to enter into confidentiality agreements or inform them to keep any files confidential (other than by marking MSAs "CONFIDENTIAL").  (*Id.* ¶¶ 14, 56).  Even after Koch Acton acquired Acton Toyota, neither Brun nor Koller became subject to any restrictive covenants or confidentiality agreements.  (*Id.* ¶ 59).

"Failure to enter into nondisclosure or confidentiality agreements often dooms trade secret claims." *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 898 (N.D. Ill.

---

[6] It is unclear the extent to which plaintiff also asserts the "marketing process" as a trade secret and the extent to which that process differs from the "entirety of these files" that are discussed.  (*Compare* Pl.'s Mem. at 13 *with* Am. Compl. ¶¶ 13, 31-33; Joint App'x Ex. 30; Pl.'s Reply at 4).  However, to the extent that is properly before the court, it is also not a trade secret for the reasons stated herein. *See also New Method Die & Cut-Out Co. v. Milton Bradley Co.*, 289 Mass. 277 (1935).

2019) (collecting cases); s*ee also Turret Labs USA, Inc. v. CargoSprint, LLC*, 2022 WL 701161,

at *2 (2d Cir. Mar. 9, 2022) (explaining that the "reasonableness analysis will often focus . . . on

the importance of confidentiality and nondisclosure agreements to maintaining secrecy");

*Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020) (holding that under

the DTSA, a company that shared information with a third-party "without a confidentiality

agreement and without other policies or practices for safeguarding secrets" did not take

reasonable steps to safeguard its trade secrets); *Mintz v. Marketing Cohorts, LLC*, 2019 WL

3337896, at *6 (E.D.N.Y. July 25, 2019) (dismissing a DTSA claim because the plaintiff "did

not require defendants to sign a non-disclosure agreement nor any sort of covenant" to protect

the confidential information).

      Furthermore, the other precautions taken by plaintiff were minimal.  All Dynamic Beacon

employees had login credentials for, and access to, the company's Google Drive account.

(Defs.' SMF ¶ 48).  And all the employees could log onto Mailchimp using a shared password

that was stored on the Google Drive and Asana through their Google Workspace account.  (*Id.* ¶¶

51, 54-55).  Password protection, absent other secrecy measures, is generally insufficient to

satisfy the standard.  *See Physiotherapy Assocs., Inc. v. ATI Holdings, LLC*, 592 F. Supp. 3d

1032, 1041 (N.D. Ala. 2022) ("the use of password-protected servers shows reasonable secrecy

only when paired with other substantial efforts") (collecting cases); *MedQuest Ltd. v. Rosa*, 2023

WL 2575051, at *5 (S.D.N.Y. Mar. 20, 2023) (finding reasonable measures to protect

inadequately pleaded where there were defendants signed no non-disclosure or non-compete

agreements but passwords were used); *Rodney v. United Masters*, 2023 WL 2184865, at *5

(E.D.N.Y. Feb. 10, 2023) (recommending dismissal of DTSA claim, stating that complaint's

allegation that plaintiff used "'passwords [and] security' [and] limited disclosure of the

information" did not suffice when "plaintiff [did] not explain how these measures operated to protect the alleged trade secrets at issue").[7]  Under the circumstances, those efforts were insufficient.

In short, all of the files are missing the "essential characteristic of a trade secret"—that is, secrecy.  *See J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 737-38 (1970) (explaining that protecting a trade secret "calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it").  Therefore, defendants' motion for summary judgment as to the DTSA and the MUTSA claims in Counts 1 and 3 will be granted, and plaintiff's motion for summary judgment as to the same claims will be denied.

## C.    Defendants' Motion for Summary Judgment as to CFAA (Count 2)

Plaintiff agrees with defendants that the clarification of the elements required for claims under the CFAA (18 U.S.C. § 1030 et seq) in *Van Buren v. United States*, 141 S. Ct. 1648 (2021), defeat their claim.  (Pl.'s Opp. at 15).  Therefore, defendants' motion for summary judgment as to Count 2 will be granted.

## D.    Plaintiff's Motion for Summary Judgment as to Breach of the Duty of Loyalty (Count 4)

Plaintiff has moved for summary judgment as to Count 4, which alleges a breach of the duty of loyalty.  Plaintiff contends that defendants had a heightened duty as founders of Dynamic Beacon and that they breached that duty when they copied the company's files.  Defendants contend that many of the relevant facts, including the nature of the retained files, the reason for

---

[7] Because they are marketing materials, many of the files at issue were able to be viewed by the public, in some form, which further undermines the trade-secret claim.  *See Take It Away, Inc. v. Home Depot, Inc.*, 2009 WL 458552, at *6 (D. Mass. Feb. 6, 2009), *aff'd*, 374 F. App'x 47 (1st Cir. 2010) ("information available for public view cannot be protected as a trade secret"); *Jillian's Billiard Club of Am., Inc. v. Beloff Billiards, Inc.*, 35 Mass. App. Ct. 372 (1993).

downloading the files, whether the files were used, and how defendants initially served Agile

clients, are disputed and preclude summary judgment. (Defs.' Opp. at 11-12).

A claim for breach of fiduciary duty requires proof of four elements: (1) existence of a

fiduciary duty, (2) breach of that duty, (3) damages, and (4) a causal relationship between the

breach and the damages. *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 164 (1999). The

duty of loyalty has been found to limit a former employee's ability to use the employer's trade

secrets or confidential information. *Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 172-73 (1991);

John F. Adkins, Mark W. Batten, Laurie F. Rubin, § 45 MASS. PRAC., EMP. L. § 9:36 (3d ed.).

Under Massachusetts law, certain employees have a duty to protect confidential

information obtained at work. *See Jet Spray Cooler v. Crampton*, 361 Mass. 835, 839 (1972);

*Advanced Micro Devices, Inc. v. Feldstein*, 951 F. Supp. 2d 212, 220 (D. Mass. 2013).

Specifically, employees who occupy positions of trust and confidence, such as officers, directors,

executives, or partners, owe a duty of loyalty to their employer and must protect the employer's

interests. *Sterling Research, Inc. v. Pietrobono,* 2005 WL 3116758, at *10 (D. Mass. 2005);

*Chelsea Industries, Inc. v. Gaffney,* 389 Mass. 1, 11 (1983).

Information does not need to rise to the level of a trade secret to qualify as protected

confidential information. *Jet Spray Cooler*, 361 Mass. at 839-40 ("[T]he duty not to use

confidential information is not limited to technical trade secrets."); *C.R. Bard, Inc. v. Intoccia*,

1994 WL 601944, at *3 (D. Mass. Oct. 13, 1994); *Paradigm Holdings, LLC v. Burr*, 866 N.E.2d

1002 (Mass. App. Ct. 2007); *Augat, Inc.*, 409 Mass. at 169 ("[T]he gross sales of a corporation

might properly be protectible as confidential in particular circumstances, although that

information would not be a 'trade secret' of the traditional kind.").

Defendants do not contest that Koller and Brun had a fiduciary duty to their employer. It

is undisputed that they were entrusted with the ongoing business operations and decision-making of Dynamic Beacon, managed all aspects of its dealer-to-dealer digital marketing services, entered into contracts on its behalf, and would only report to the owner upon inquiry.  (Pl.'s SMF ¶ 3).  Those facts are sufficient to place them within the category of "officers, directors, executives, and partners" occupying positions of trust and confidence and thus giving rise to a duty of loyalty.  *Sterling*, 2005 WL 3116758, at *10.  Koller and Brun therefore had a duty to protect any of Dynamic Beacon's confidential information.

However, there is a material dispute as to whether defendants did in fact breach that duty. Plaintiff alleges that defendants "undertook efforts to undermine the company they helped build by taking files that encompassed a carbon copy of Dynamic Beacon, for their personal gain, with no doubt knowing it would be to Dynamic Beacon's detriment as they lost clients."  (Pl.'s Mem. at 10).  However, the use of purely proprietary information, as opposed to *confidential* proprietary information, is not normally sufficient under Massachusetts law to support a claim for breach of the duty of loyalty.  *See Augat, Inc.*, 409 Mass. at 168 ("We disagree with this ruling [that defendants were liable for breach of duty of loyalty] because information concerning Isotronics's general level of sales was not confidential and no specific information concerning that level of sales was required by prospective venture capitalists."); *see also id.* at 169 ("We shall assume that, in particular circumstances, the amount of Isotronics's gross annual sales of metal packages could be protectible, confidential information, and, if so, an employee would have a duty not to disclose that information."); *New England Overall Co. v. Woltmann*, 343 Mass. 69, 75-76 (1961); *Woolley's Laundry v. Silva*, 304 Mass. 383, 389-392 (1939).  The critical question, therefore, is whether the files at issue were confidential.

To determine whether materials are confidential, Massachusetts courts generally look to

the same factors used to determine the existence of trade secrets.  *See, e.g.*, *Paradigm Holdings, LLC v. Burr*, 2007 WL 1531840, at *2 (Mass. App. Ct. 2007); *Augat, Inc.*, 409 Mass. at 169-70. Those factors include

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Jet Spray Cooler*, 361 Mass. at 840.  When determining claims of misappropriated confidential information, "the result in each case depends on the conduct of the parties and the nature of the information."  *Jet Spray Cooler*, 361 Mass. at 840.

Although many of the same considerations apply, the determination whether a matter is a trade secret or confidential information is subject to a different analysis.  For example, whether there was a confidentiality agreement does not weigh as decisively in determining a claim of misappropriation of confidential information.  The duty to maintain confidential information derives from the relationship rather than any specific agreement.  *See New England Overall Co., Inc.*, 343 Mass. at 75 ("[W]here there has been no express contract of an employee not to use or disclose confidential information entrusted to him during his employment, . . . although an employee may carry away and use general skill or knowledge . . . , he may be enjoined from using or disclosing confidential information so acquired."); *E. Marble Prods. Corp. v. Roman Marble, Inc.*, 372 Mass. 835, 841 (1977) ("It is settled by our cases that the duty of an employee not to disclose confidential information is grounded on basic principles of equity . . . and upon an implied contract, growing out of the nature of the employer-employee relation." (internal citations omitted)).

Here, some of the critical facts relevant to the confidentiality determination—for

example, the extent to which frameworks were publicly available—are disputed.  Defendants'

technical expert states that 97% of the code lines in certain files at issue and between about 50%

to 84% of others matched files that were publicly available at the time of his report.  (Joint

App'x Ex. 33 at 31-32).  He describes the differences in the code that did exist as "not

significant."  (*Id.* at 33).  Plaintiff, however, disputes that assertion, and contends that merely

copying the code would not produce a viable product for use by clients.  (Pl.'s SMF ¶ 126, 128).[8]

It is not clear from the record what amount of work would be required to edit such files into

final, usable forms and to what extent that process is confidential.  Plaintiff appears to contend

such creation and testing can take years, whereas defendants suggest code could be quickly re-

designed.  (*Id.* ¶ 26).  Thus, the degree to which those materials are able to be "acquired or

duplicated by an observant party" is disputed, even though the materials are marketing products.

*See Jillian's Billiard Club of Am.*, 35 Mass. App. Ct. at 375-76 (information underlying

advertisements not confidential because it "could readily be obtained by reading the

advertisements."); *Agero, Inc. v. Rubin*, 88 Mass. App. Ct. 1104, at *6 (2015).  Moreover, those

determinations may require credibility assessments that are inappropriate at this phase.

    Similarly, although no one contends the Asana files or client e-mail lists were publicly

available, it is not clear from the record how confidential such lists were, how valuable that

information was, or the ease or difficulty with which the information could be properly acquired

or duplicated by others.  *See Jet Spray Cooler*, 361 Mass. at 840; *New England Overall Co. v.*

*Woltmann*, 343 Mass. at 76 (finding client lists may be found confidential or not depending on

---

[8] In addition, plaintiff's expert contends that there is code reuse between Dynamic Beacon and Agile files because the lowest similarity score among the related files is 44%, as determined using a source code plagiarism detection software.  (Joint App'x Ex. 35 at 11-12).  He concludes "it is more likely than not that [Agile] reused code originally created at Dynamic Beacon."  (*Id.* at 6).

the circumstances); *Augat Inc.*, 409 Mass. at 169-71 (finding that although an employer's gross sales information might sometimes be confidential, the information was not protectable under the circumstances where the plaintiff had previously disclosed the information, had not consistently treated it as confidential, and outsiders were able to approximate the information); *Agero, Inc.*, 88 Mass. App. Ct. at *6.

Furthermore, it is disputed whether defendants have profited from the use of the resources of Dynamic Beacon.  (Pl.'s SMF ¶ 58).  Defendants contend that "[a]t no point did Defendants or anyone working for them use any files from Dynamic Beacon in the formation of Agile or to serve Agile customers."  (*Id.*).  Plaintiff disputes that, and contends that the fact that Agile created software repositories with significant amounts of code quickly reflects the fact that misappropriated files were used.  (*See* Pl.'s SMF ¶¶ 42-45).

In short, many of the relevant facts are genuinely disputed, precluding summary judgment as to the claim for breach of the duty of loyalty.  Accordingly, plaintiff's motion for summary judgment will be denied as to Count 4.

E.     **Cross-Motions for Summary Judgment as to Tortious Interference with Business Relations (Count 5)**

Count 5 asserts a claim for intentional interference with advantageous relations.  Under Massachusetts law, the elements of that claim are that "(1) [the plaintiff] had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007).

Both parties have moved for summary judgment as to Count 5.  Plaintiff contends "the

23

record is replete with uncon[tro]verted evidence of Defendants' improper motive commencing with copying files and then downloading them to Agile's [G]oogle [D]rive. . . . Such actions interfered with Dynamic Beacon's business relationships, to its detriment."  (Pl.'s Mem. at 11).

To the extent the tortious-interference claim requires proof of improper intent, summary judgment is inappropriate.  (*See* Defs.' SMF ¶ 62).  "The improper motive required by the torts is actual malice:  'a spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" *Comeau v. Town of Webster*, 881 F. Supp. 2d 177, 190 (D. Mass. 2012) (quoting *Wright v. Shriners Hosp. for Crippled Child.*, 412 Mass. 469, 476 (1992)); *Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 658 (2006) ("The improper conduct 'may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion),'; the plaintiff need not prove both." (internal citations omitted)).  A mere desire to benefit oneself or one's principal is not sufficient.  *Hamann v. Carpenter*, 937 F.3d 86, 90 (1st Cir. 2019) (citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811 (1990)).  Such matters, which involve proof of the mental state of an actor, rarely, if ever, can be determined as a matter of law.

To the extent the claim requires proof of improper means, the material facts are also disputed.  "Improper means" typically involve violations of a statute or common-law principle. *Cavicchi*, 67 Mass. App. Ct. at 658.  It cannot be determined at this stage whether any copying was improper.  *See Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 186 (D. Mass. 2023) (concluding that if a jury determined defendant misappropriated trade secrets, it could also determine defendant tortiously interfered by improper means); *Biopoint, Inc. v. Andrew Dickhaut & Catapult Staffing, LLC D/B/A Catapult Solutions Group*, 2021 WL 4311651, at *4 (D. Mass. Sept. 22, 2021) ("misappropriation of confidential information can constitute an improper means"); *DiFronzo v. City of Somerville*, 2023 WL 5528982, at *7 (D.

Mass. Aug. 28, 2023) (denying summary judgment with respect to tortious interference claims where other state-law counts were also denied).

Furthermore, plaintiff's claim of tortious interference does not fail as a matter of law, as defendants contend, for lack of a causal connection.  Defendants appear to contend that plaintiff was not in fact harmed by defendants' copying, even assuming it was improper.  "[A] plaintiff [can]not recover on a claim for tortious interference with advantageous relationships where she ha[s] failed to show that she ha[s] suffered any pecuniary loss as a result of the defendant's actions."  *Tech Plus, Inc. v. Ansel*, 59 Mass. App. Ct. 12, 18 (2003); *Hamann v. Carpenter*, 937 F.3d 86, 93 (1st Cir. 2019) (quoting same).  But assuming, as the Court must, that plaintiff can establish improper motive or means, a causal connection is certainly plausible on the current evidence.  *Cf. Hunneman Real Est. Corp. v. Norwood Realty, Inc.*, 54 Mass. App. Ct. 416, 426-28 (2002) (analyzing motives and means).  Among other things, it is disputed whether defendants used Dynamic Beacon files to service clients after they departed and whether defendants' ability to offer service to clients within days induced clients to retain Agile, even if the clients were unaware of any copying.  (Defs.' SMF ¶¶ 75-76).  *Cf. Conning v. Halpern*, 2021 WL 1580837 (D. Mass. Apr. 22, 2021) (finding evidence from which a reasonable jury could find that by encouraging a halt in publishing of certain materials, defendants caused plaintiffs to lose money).

In short, a reasonable jury could find for either party on the factual issues as to the claim for tortious interference.  Both motions for summary judgment as to Count 5 will therefore be denied.

F.    **Plaintiff's Motion for Summary Judgment as to Unjust Enrichment (Count 6)**

Count 6 asserts a claim for unjust enrichment.  Plaintiff sought summary judgment as to

unjust enrichment in the alternative, should they have no other claim at law. *See Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) ("[A] party with an adequate remedy at law cannot claim unjust enrichment."). Because the Court has not determined that plaintiff lacks a claim at law, plaintiff's motion for summary judgment as to Count 6 will be denied.

G.    **Cross-Motions for Summary Judgment as to Breach of Mass. Gen. L. ch. 93A (Count 7)**

Count 7 alleges that defendants' conduct was unfair and deceptive within the meaning of Mass. Gen. Laws ch. 93A, § 11. Specifically, it alleges that defendants unlawfully accessed and copied Dynamic Beacon's confidential information, intending to misappropriate it and that defendants "completely wiped" their employer-issued computers in an attempt to conceal and deceive Plaintiff. (Am. Compl. ¶¶ 76-77).

A Chapter 93A claim must allege a practice that (1) is within "the penumbra of some common-law, statutory, or other established concept of unfairness," (2) is "immoral, unethical, oppressive, or unscrupulous," and (3) "causes substantial injury to consumers," competitors, or other business entities. *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005); *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). Section 11 of Chapter 93A further provides that an action can be brought only if "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." *Id.* § 11.

Defendants contend that the § 11 claim fails as a matter of law for two reasons. First, they contend that the "'center of gravity' of the alleged Chapter 93A violations is in Vermont" rather than Massachusetts. (Defs.' Mem. at 20). Second, they contend that because Agile was not formed until January 22, 2021, and any accessing, copying, or wiping of laptops occurred

prior to that date, Agile could not have participated in the alleged unfair or deceptive acts.  (*Id.*).

"Where an employee misappropriates his or her employer's proprietary materials during the course of employment and then uses the purloined materials in the marketplace, that conduct . . . comprises a marketplace transaction that may give rise to a claim under [Chapter] 93A, § 11."  *Governo L. Firm LLC*, 487 Mass. 188, 195-96.  While those facts are in genuine dispute for the reasons stated herein, plaintiff's contention, if true, could clearly constitute an unfair or deceptive act or practice.  *See id.*; *see also Peggy Lawton Kitchens, Inc. v. Hogan*, 18 Mass. App. Ct. 937, 939 (1984); *Informix, Inc. v. Rennell*, 41 Mass. App. Ct. 161, 164 n.2 (1996).

The center of gravity of the conduct also appears to be in Massachusetts.  Defendants bear the burden of proving that the complained-of conduct occurred outside the state.  Mass. Gen. Laws ch. 93A, § 11; *Zyla v. Wadsworth*, 360 F.3d 243, 255 (1st Cir. 2004).  The critical inquiry is "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  *Kuwaiti Danish Comput. Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473 (2003).  "In making that determination, a court should focus solely on the actionable conduct said to give rise to the violation; other conduct, no matter where it takes place, may not be considered."  *Monahan Prods. LLC v. Sam's E., Inc.*, 463 F. Supp. 3d 128, 151 (D. Mass. 2020); *Kuwaiti*, 438 Mass. at 473-74.

Here, it is undisputed that Koller performed the exports from MailChimp from his home in Vermont and that he downloaded "Google Drive Client Files" on January 11 and 15, 2021. (Defs.' SMF ¶ 65; Pl.'s SMF ¶¶ 29-30).[9]  It is also uncontested that the suspicious logins on January 11 and 15, 2021 "came from a Mac computer in Vermont on both occasions."  (Defs.'

---

[9] There are no allegations regarding the place of Brun's downloading.

SMF ¶ 63; Joint App'x Ex. 27 at 5).[10]  Nonetheless, at the time of the alleged misappropriation,

he was employed in Massachusetts, and the files were owned by a Massachusetts company.

Furthermore, because Agile was formed under another Massachusetts dealership, the contested

use of the materials appears to have been primarily and substantially within Massachusetts.

(Pl.'s SMF ¶¶ 10-11).  *See Kuwaiti*, 438 Mass. at 473 ("the sheer number of instances of

misconduct in one jurisdiction may produce the heft needed to resolve the question.").  Here,

defendants have not even shown that the significant contacts of the competing jurisdictions are

approximately in balance with Massachusetts.  *See Uncle Henry's, Inc. v. Plaut Consulting Co.*,

399 F.3d 33, 45 (1st Cir. 2005).

Defendants further contend that Agile cannot be liable under Chapter 93A because it

could not have participated in the accessing and copying of Dynamic Beacon's files, as it did not

exist on January 22, 2021.  Again, according to *Governo L. Firm LLC*, "[w]here an employee

misappropriates his or her employer's proprietary materials during the course of employment and

then uses the purloined materials in the marketplace, that conduct . . . comprises a marketplace

transaction that may give rise to a claim under [Chapter] 93A, § 11."  487 Mass. at 195-96.  As

described, both the misappropriation itself and the use of the misappropriated materials in the

marketplace comprise conduct that may give rise to a Chapter 93A claim.  In fact, if Agile used

those files in its business—necessarily, of course, subsequent to its formation—it may be subject

to Chapter 93A liability.  While it is true that the legal formation of the corporate entity occurred

after the misappropriation, the use of knowingly misappropriated materials is certainly within the

---

[10] To the extent either party relies on the factory resets of the Dynamic Beacon laptops, that conduct does not weigh heavily into the analysis. (*See* Defs.' Mem. at 20).  The record reflects that during Brun and Koller's employment at Dynamic Beacon, it was the customary practice for either Brun or Koller to factory reset the computers of former Dynamic Beacon employees upon termination of their employment.  (Pl.'s SMF ¶ 106).

penumbra of some common-law, statutory, or other established concept of unfairness, unethical, and may cause substantial injury to a competitor.  *See Governo L. Firm LLC*, 487 Mass. at 195 n.14 (suggesting a jury could consider the pre-separation conversion by individual defendants when determining whether the corporate defendant was liable under Chapter 93A, § 11.); *see also Specialized Tech. Res., Inc. v. JPS Elastomerics Corp.*, 80 Mass. App. Ct. 841 (2011) (finding Chapter 93A claim could be brought against former employee and new employer); *Peggy Lawton Kitchens*, 18 Mass. App. Ct. at 939 (applying Chapter 93A to corporate defendant).  Thus, both motions for summary judgment as to the liability of Agile under Chapter 93A will be denied.

### H.    Cross-Motions for Summary Judgment as to Conversion (Count 8)

Count 8 alleges a claim for conversion.  Under Massachusetts law, a party may be liable for conversion if he "intentionally or wrongfully exercised acts of ownership, control or dominion over personal property to which he has no right of possession at the time. . . ."  *In re Brauer*, 452 Mass. 56, 67 (2008) (citations omitted).  The First Circuit has articulated the elements of the tort slightly differently, holding that a plaintiff alleging conversion under Massachusetts law must show that

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993).

To prove conversion, a plaintiff must further demonstrate that "the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property."  *Kelley v. LaForce*, 288 F.3d 1, 11-12 (1st

Cir. 2002). "It is no defense to conversion for [a] defendant to claim that he acted in good faith,

reasonably believing that he had a legal right to possession of the goods." *Id.* at 12. "Moreover,

'[c]onversion does not require an intent to deprive the owner permanently of the property . . . .

Rather, one only need intent to exercise dominion or control over the property of another and can

be held liable for conversion even if the property over which he exercised control was believed

to be his own.'" *In re Zak*, 573 B.R. 13, 42 (Bankr. D. Mass. 2017) (quoting *In re Sloane*, 2002

WL 1000956, at *6 (Bankr. D.N.H. Mar. 25, 2002)).

Defendants contend that the conversion claim fails because plaintiff does not own the

client work product, and that plaintiff cannot prove damages because defendants copied, rather

than permanently taking, any property.

The four categories of materials at issue are the Asana files, the Google Drive files, the

frameworks and stylesheets, and the e-mail lists. The e-mail lists are undisputedly owned by

Dynamic Beacon. As to the other files, some portion of them has been characterized as client

work product. Whether they are owned by Dynamic Beacon is a disputed question of fact. *Cf.*

*Warner-Lambert Co. v. Execuquest Corp.*, 427 Mass. 46, 49 (1998) (determining a factual

inquiry was required to determine whether information acquired by defendant was proprietary).

However, even assuming that some of the files are not owned by Dynamic Beacon, proof of

ownership is not required for conversion. Plaintiff must have "had an ownership *or possessory*

*interest* in the property at the time of the alleged conversion." *Evergreen Marine Corp.*, 4 F.3d

at 95.

For example, in *Evergreen Marine Corp.*, the plaintiff was only a type of bailee, not an

owner, but was nonetheless able to assert a claim for conversion. *Id.* at 98. Here, if Dynamic

Beacon did not own certain files, it could still be considered in rightful possession of them

30

pursuant to the MSAs. *See* BLACK'S LAW DICTIONARY, BAILEE (11th ed. 2019) ("Someone who receives personal property from another, and has possession of but not title to the property."). Depending on the facts, that may give Dynamic Beacon sufficient standing to assert a claim of conversion and meet the second element of the claim, even as to client work product.

There are also disputed facts as to injury and damages. Defendants contends that plaintiff cannot show any permanent loss, because the files were merely copied. However, such a loss may be sufficient to support a claim for conversion. In *Governo L. Firm, LLC v. CMBG3 Law, LLC*, certain attorneys were found liable for conversion for copying an electronic research library, databases, and administrative files. 36 Mass. L. Rep. 24, 2019 Mass. Super. Lexis 444, *4-6 (2019). The fact that those files were electronic, and plaintiff retained copies of all the materials defendants had taken, did not preclude liability. *Id.* at *6; *see also Governo L. Firm LLC v. Bergeron*, 487 Mass. 188, 196-97 (2021) (finding prejudicial error where the trial judge instructed the jury not to consider the copying conversion that occurring during defendants' employment for Chapter 93A liability).

Nor is the damage allegedly caused by defendants' conduct so certain that plaintiff's motion for summary judgment may be granted. Again, the use of the potentially copied materials is disputed, as is any damage that might have resulted from that use. Put simply, the record neither suggests that plaintiff was not damaged at all by defendants' conduct nor that it was certainly damaged by that conduct. Accordingly, the cross-motions for summary judgment as to Count 8 will be denied.

## IV. <u>Conclusion</u>

For the reasons set forth above,

1. Defendants' Motion for Summary Judgment is DENIED to the extent it seeks summary judgment as to

       a.   all counts for lack of standing;

       b.   the claim for tortious interference with business relations (Count 5);

       c.   the claim for violation of Mass. Gen. Laws ch. 93A (Count 7); and

       d.   the claim for conversion (Count 8).

2.   Defendants' Motion for Summary Judgment is GRANTED to the extent that it seeks summary judgment as to

       a.   the claim for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1) (Count 1);

       b.   the claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count 2); and

       c.   the claim for violation of the Massachusetts Uniform Trade Secrets Law, Mass. Gen. Laws ch. 93, §§ 42, 42A (Count 3).

3.   Plaintiff's Motion for Summary Judgment is DENIED.

**So Ordered.**


                                  /s/ F. Dennis Saylor IV
                                  F. Dennis Saylor IV
Dated:  March 13, 2024          Chief Judge, United States District Court